# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| JOHN SMITH, | ) | |
|       Petitioner, | ) | |
|  | ) | |
| v. | ) | No. 2:16-cv-02776-TLP-tmp |
|  | ) | |
| CHERRY LINDAMOOD, | ) | |
|       Respondent. | ) | |

## ORDER OF DISMISSAL
## ORDER DENYING CERTIFICATE OF APPEALABILITY
## ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
## AND
## ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL

Petitioner John Smith[1] petitions under 28 U.S.C. § 2254. (Petition ("Pet."), ECF No. 1.) The petition did not follow the format of the district court's official form. (*Id.*) In 2016, United States District Judge John T. Fowlkes ordered Petitioner to amend his petition using the official form. (Order, ECF No. 4.) Petitioner Smith amended his petition, but the amendment did not comply with the Court's order. (Amended ("Am.") Pet., ECF No. 6.) He then amended the petition a second time in 2017. (Second Am. Pet., ECF No. 10.) This Court considers the second amended petition as the operative pleading. Respondent filed the state court record and answered. (Record ("R."), ECF Nos. 14 & 15.) Smith then replied to Respondent's answer. (Reply, ECF No. 16.)

---

[1] Smith is a state prisoner, Tennessee Department of Correction ("TDOC") prisoner number 486095. Tennessee is housing him currently at the South Central Correctional Center ("SCCC") in Clifton, Tennessee.

As more fully discussed below, Petitioner raises many issues here that fall into three categories: 1) whether the state court identified and applied the correct federal legal principles, 2) whether the claim is barred by the procedural default doctrine, and 3) whether the claim presents a question of federal law. For the reasons discussed below, the petition is **DISMISSED**.

**STATE COURT PROCEDURAL HISTORY**

In 2008, a Shelby County, Tennessee grand jury returned an indictment against John Smith and co-defendant James Snipes charging them with first-degree felony murder, premeditated murder, aggravated burglary, and employing a firearm during the commission of a felony. (R., Indictments, ECF No. 14-1 at PageID 287–94.) And the indictment charged a third co-defendant, Jesus Lujan, with facilitation of a felony and aggravated burglary. (*Id.* at PageID 290–91.)

Smith's defense counsel moved to suppress Petitioner Smith's confessions. (Motion ("Mot.") to Suppress, ECF No. 14-1 at PageID 324–25.) After a hearing, the trial court denied the motion to suppress. (Order, ECF No. 14-1 at PageID 326–33.) The case went to trial and the jury convicted John Smith of first-degree felony murder, aggravated burglary, and employing a firearm during the commission of a felony. (R., Minutes ("Mins."), ECF No. 14-1 at Page ID 338.)

The trial court sentenced Smith to life imprisonment plus six years. (R., Judgments ("J."), ECF No. 14-1 at PageID 367–71.) Smith appealed. (R., Notice of Appeal, ECF No. 14-1 at PageID 398–99.) The Tennessee Court of Criminal Appeals ("TCCA") affirmed Smith's conviction and sentence. *State v. Smith*, No. W2011-01438-CCA-R3-CD, 2012 WL 4372547 (Tenn. Crim. App. Sept. 25, 2012), *perm. app. denied* (Tenn. Feb. 13, 2013). The Tennessee Supreme Court declined to accept the case on further appeal. (*Id.*)

Next Smith petitioned *pro se* for relief in Shelby County Criminal Court under the Tennessee Post-Conviction Procedure Act, Tennessee Code Annotated §§ 40-30-101 to 40-30-122. (R., Pet. for Post-Conviction Relief, ECF No. 14-19 at PageID 1466–80.) Smith then amended that petition. (Supplemental R., Am. Pet., ECF No. 14-22 at PageID 1569–77.) A bit later, his appointed counsel filed an addendum to the amended petition. (R., Addendum, ECF No. 14-19 at PageID 1482–93.) The post-conviction court conducted an evidentiary hearing and denied relief in January 2015. (R., Order, ECF No. 14-19 at PageID 1494–1503.) Smith appealed that ruling. (R., Notice of Appeal, ECF No. 14-19 at PageID 1504.) The TCCA affirmed. *Smith v. State*, No. W2015-006333-CCA-R3-PC, 2016 WL 3345247 (Tenn. Crim. App. May 27, 2016), *perm. app. denied* (Tenn. Oct. 17, 2016).

For factual and procedural background from the state court, this Court will recite the summary from the TCCA's opinion from the direct appeal.

I.      **Facts**

> The defendant was indicted on charges of first degree felony murder, first degree premeditated murder, aggravated burglary, and employing a firearm during the commission of a felony due to his and a co-defendant's, James Snipes, involvement in the shooting death of the victim, Charles Beegle, Jr.

> A.      **Motion to Suppress**

> The defendant filed a motion to suppress his statements to the police, and a hearing was held on the motion prior to trial. At the hearing, Sergeant Joe Stark of the Memphis Police Department testified that his first encounter with the defendant occurred on August 3, 2008. On that date, Sergeant Stark went to pick up the defendant from the jail at 8:55 a.m. Upon arriving at the homicide office, the defendant was allowed to use the restroom and given a snack and something to drink. At 10:03 a.m., Sergeant Stark advised the defendant of his rights, at which time the defendant informed him that he had an attorney. Based on the defendant's invocation of his rights, Sergeant Stark left the interview room. The defendant remained in the interview room, secured to a bench.

A few minutes later, the defendant started yelling that he wanted to talk to someone, so Sergeant Stark and Sergeant Davidson returned to the interview room. Sergeant Stark advised the defendant of his rights again, and the defendant said, "I am going to talk to you, but I want a cigarette, I want to talk to my dad and I want to talk to my lawyer." When Sergeant Stark asked the defendant for his attorney's name, the defendant responded, "Jeff Rosenblum." The defendant then began to question the officers about the case and the charges against him. Sergeant Stark informed the defendant that he was going to be charged with first degree murder and that they were going to take him back to the jail. At that point, the officers left the interview room again, and Sergeant Stark asked Sergeant Max to prepare the defendant to be transported back to the jail. According to Sergeant Stark, the defendant refused to waive his *Miranda* rights the second time at 10:17 a.m.

Shortly after Sergeant Max went into the interview room, he came out and informed the other officers that the defendant wanted to talk to them. Sergeants Stark and Davidson returned to the interview room and advised the defendant of his rights a third time, at 10:44 a.m. This time, the defendant waived his rights and the officers interviewed him and then took a typed statement from him, which the defendant signed at 3:37 p.m. In his statement, the defendant denied being responsible for the victim's death and said that James Snipes was the person responsible. Sergeant Stark recalled that the defendant appeared to be sober and not under the influence of any substance, and he was not threatened or coerced into giving a statement.

After Snipes, a co-defendant, was interviewed, Sergeant Stark returned to the defendant and confronted him with contradictions in their stories. Thereafter, the defendant gave another typed statement, which he signed at 5:10 p.m. Specifically, the defendant had not told the officers in his first statement about being in possession of a .38 revolver and shooting the victim or about Jesus Lujan being present at the time of the killing.

Sergeant James Terry Max of the Memphis Police Department testified that he was asked to prepare the defendant to be transported back to the jail. When he entered the interview room, the defendant asked what was going on, and Sergeant Max responded that he was going to take the defendant back to the jail. The defendant queried again as to what was going on, and Sergeant Max said to him, "I can't discuss with you what's going on, you don't want to waive your rights, I can't talk about this case." According to Sergeant Max, the defendant then stated that he wanted a cigarette and wanted to talk. Sergeant Max left the room and informed Sergeant Hanks, the case coordinator, that the defendant wanted to talk. Sergeant Max had no further interaction with the defendant.

The defendant testified that he was taken to the homicide department around 9:00 or 10:00 p.m. on August 2, 2008. He said that he told the officers

that he was intoxicated on "[h]eroin, powder and some pills." Due to his condition, the defendant was taken to the jail. He claimed that he was "dope sick" that evening and was not provided with medical attention. He eventually fell asleep around 2:00 or 3:00 a.m. on August 3 and was awoken at 7:38 a.m. The defendant recalled that Sergeants Stark and Davidson picked him up and took him to the homicide office around 10:00 a.m.

The defendant denied that the officers ever offered him anything to eat or drink. However, he said that the officers allowed him to use the restroom after he told them that his stomach was hurting from having used heroin. He said that he could tell he was suffering from heroin withdrawals but admitted that he did not explain that to the officers.

The defendant corroborated Sergeant Stark's testimony that Sergeant Stark left the room after the defendant refused to waive his *Miranda* rights and requested an attorney. However, the defendant denied that he thereafter screamed and yelled for Sergeant Stark to return, claiming instead that the officers came back in after ten or fifteen minutes without his beckoning. He recalled that, when the officers returned, they asked him if he wanted to make a statement. Similarly to Sergeant Stark, the defendant stated that he refused to waive his rights and requested a cigarette, to speak with his father, and to speak with his attorney, Jeff Rosenblum. Upon the defendant's refusal, the officers left the room again.

The defendant recalled that, ten or fifteen minutes later, Sergeant Max entered the room and told him that it was all right if he did not want to make a statement because Snipes, his co-defendant, had given them information. He claimed that Sergeant Max also told him that he was going to get the death penalty because there was someone who was going to testify against him. He said that Sergeant Max told him, however, that he would receive a sentence of thirteen to fifteen years if he gave a statement. Based on what Sergeant Max told him and his fear of receiving the death penalty, the defendant decided to make a statement.

On cross-examination, the defendant admitted that neither Snipes nor anyone else saw him take heroin or powder cocaine on the day of the offenses. However, he said that Snipes saw him take Ecstasy, Xanax, Seroquel, and marijuana. He acknowledged that nowhere in his statement did he say that he was giving the statement in order to not face the death penalty and instead receive a sentence of thirteen to fifteen years.

The trial court denied the defendant's motion to suppress, finding that his statements were not given in violation of his Fifth Amendment rights.

## II.      Trial

### A.      State's Proof

Charles Eddie Beegle, III, the victim's son, was living with his father at 4370 Zelda Lane in Memphis at the time of his father's death.  On August 1, 2008, Beegle left the house around 7:00 p.m. to spend the night with a friend.  Around 9:00 a.m. the next morning, a friend of his father's called to tell him that he needed to come home.  When he arrived at the house around 10:00 a.m., the police were there and the house was surrounded with crime scene tape.  Shortly after he arrived, he learned that his father had been shot and was dead.

After the police left the scene, Beegle inspected the inside of the house and noticed that it was in a much different condition than it had been when he left the previous night.  In the living room, the couch cushions had been turned up and items had been knocked onto the floor.  In the victim's bedroom, clothes had been pulled out of the closet and the dresser drawers were open, appearing as though they had been rummaged through.  He also noticed that the metal tins in which his father kept his marijuana were not in their normal locations and had been opened.  Money was missing from the victim's dresser, and one of his wallets was on the floor.  Further examination of the house revealed that the sliding glass door in the back of the house appeared to have scratches and pry marks as though someone had tampered with it, and the BB gun that the victim kept next to the back door was missing.  The victim's cell phone was also missing.

Darrell Sebring, a neighbor and friend of the victim's, was visiting the victim the evening of July 31, 2008, around 6:00 or 7:00 p.m., when three people in a blue Ford Sport Track stopped by the victim's house, and one of the young men in it was identified to Sebring by the victim as James Snipes.  Snipes asked the victim, "Do you have some?"  Sebring acknowledged that the victim was known to sell drugs and that the victim told him that Snipes had taken drugs from him before.

Randy Broome, a neighbor of the victim, was outside the morning of August 2, 2008, around 9:00 a.m., when he heard gunshots coming from the direction of the victim's house followed by a man yelling for help.  Bonnie Hazel, another neighbor of the victim, heard what appeared to be gunshots coming from the direction of the victim's house between 9:00 and 9:30 that same morning and heard someone crying for help.  Shortly after hearing the gunshots, Hazel saw a white male outside the victim's house.  Hazel also noticed a dark blue or black truck parked in front of the victim's house and then saw the truck leave.  Because the truck's windows were tinted, Hazel could not see who was inside.  She then saw another white male, wearing baggy pants and no shirt and carrying what appeared to be a rifle behind his back, walk down the victim's driveway.  She next saw the truck return and pick up the young man.  At that point, Hazel, her

brother, and another neighbor went to the victim's home to check on him. When they arrived, they saw the victim lying facedown on the carport with a pool of blood under his head and not breathing.

Sergeant Roger Wheeler, a crime scene officer with the Memphis Police Department, processed the scene at the victim's house, which included taking photographs and collecting evidence. Among the items of evidence collected at the scene were three .25 caliber automatic shell casings and a cigarette butt.

Dr. Miguel Laboy, a forensic pathologist with the Shelby County Medical Examiner's Office, conducted the autopsy on the victim and determined that he suffered three gunshot wounds, one to the upper portion of the head, one to the left shoulder, and one to the front left side of the chest. With regard to the head wound, determined to be the lethal injury, Dr. Laboy hypothesized that the slightly downward wound track was consistent with the gun being above the victim's head. Two bullets and one bullet fragment were recovered during the autopsy. It was determined that the victim died from multiple gunshot wounds.

Officer Richard Morrow with the Memphis Police Department was on patrol around 1:00 p.m. on August 2, 2008, when he saw a dark blue Ford Explorer truck matching the description of the one seen at the scene of a homicide earlier that day. As soon as he saw the truck, it made a quick right turn and started accelerating. Officers pursued the vehicle, trying to get it to stop, but it would not comply. During the pursuit, Officer Morrow saw the defendant slide open the back window of the truck and point a black automatic handgun out the window in his direction. When the truck ran a red light, another car came through the intersection and hit it, bringing the pursuit to an end. The driver of the truck, James Snipes, fled the scene, but the defendant remained in the vehicle and was taken into custody.

Officer Stacy Milligan, a crime scene officer with the Memphis Police Department, was dispatched to the scene of the crash where he assisted in processing the crashed Ford Explorer truck. Among the contents found in the truck were $475 of cash under the driver's side visor and marijuana on the console. Two weapons were collected from the vehicle—a loaded .380 nine-millimeter handgun found on the front driver's side of the vehicle and a loaded .25 caliber handgun found on the floorboard of the back of the vehicle on the passenger's side.

Lieutenant Barry Hanks of the Memphis Police Department transported buccal swabs taken from James Snipes and a .38 special Colt revolver recovered from a location revealed by Jesus Lujan to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory for testing. Lieutenant Hanks also transported three .25 caliber shell casings and a cigarette butt found at the crime scene, a three bullet pack retrieved from the medical examiner's office, and the .25 caliber and

.380 nine-millimeter handguns recovered from the wrecked truck. Lieutenant Hanks also noted that the victim's cell phone was located in the bed of the wrecked truck.

Qadriyyah Debnam, a forensic scientist with the TBI Crime Lab at the time of the offenses, tested the cigarette butt submitted by Lieutenant Hanks and determined that the DNA on it was a match to James Snipes. Donald Carman, another forensic scientist with the TBI Crime Lab, tested the weapons, the three .25 caliber shell casings, and the bullets and bullet fragment retrieved from the medical examiner's office that were submitted by Lieutenant Hanks. All of the bullets and shell casings were fired from the submitted weapons. The bullet fragment was consistent with being fired from the submitted .25 caliber weapon.

On August 3, 2008, around 10:30 a.m., Sergeant Max was asked by Sergeant Stark to get the defendant ready for transport back to the jail from the interview room due to the defendant's refusal on two occasions to waive his *Miranda* rights. The defendant inquired as to what was going on, and Sergeant Max informed him that he could not talk about the case. The defendant told Sergeant Max that he wanted a cigarette and then would talk to the officers, which Sergeant Max relayed to Sergeant Stark, the interviewing officer. Sergeant Max denied telling the defendant he would get the death penalty if he did not talk to the officers or that he would get thirteen to fifteen years if he did talk to them.

Lieutenant Walter Davidson with the Memphis Police Department was involved in arresting the defendant after the wreck and placed him on a forty-eight-hour hold due to his intoxication. The next day, having no appearance of intoxication and able to communicate clearly, the defendant was brought to the homicide bureau for questioning. After twice refusing to waive his *Miranda* rights, the defendant was being prepared for return to the jail when he decided to talk to the officers. Upon being read his rights a third time, the defendant waived them and ultimately gave two typewritten statements.

In his first statement, the defendant denied any responsibility for the victim's death but, instead, blamed the murder on his co-defendant, James Snipes. Specifically, the defendant said that he and Snipes were driving around smoking marijuana when Snipes started talking about "making money." Snipes then stopped at the victim's house and said, "[L]et's go in." According to the defendant, before Snipes made it in the house, the victim spotted him and started chasing him. The defendant said that Snipes and the victim "scuffled" and then he heard gunshots. He recalled that Snipes told him that he shot the victim because the victim grabbed him and would not let him go. According to the defendant, Snipes was armed with a .25 caliber automatic, but he was not armed. When questioned about the subsequent police chase, the defendant admitted that he was in the backseat of the truck and armed with a .25 caliber automatic but claimed that it and the .380 belonged to Snipes.

After taking the defendant's first statement, officers learned that Jesus Lujan was in the truck with Snipes and the defendant at the time of the murder and that the defendant had been armed with a .38 revolver. The officers confronted the defendant with the inconsistencies from that in his first statement. In his second statement, the defendant admitted that his initial statement was not completely accurate. He confirmed that Lujan was in the truck with him and Snipes when they went to the victim's home and that he was armed with a .38 special revolver provided to him by Lujan. The defendant also admitted that he entered the victim's house with Snipes. According to the defendant, after they entered the house, " 'the victim s[aw] [Snipes] [and] chased him outside. They started [to] wrestle and [Snipes] shot him to get him off and while the victim was on the ground, I shot him in the face.' " He gave the .38 special revolver back to Lujan after the shooting.

## B.      Defendant's Proof

The defendant testified that the night before the shooting, he and Snipes were partying at another friend's house. He had been "smoking weed, taking expills, snorting heroin, snorting powder and popping Xanax pills." Around 8:00 a.m. the next morning, the defendant, Snipes, and Jesus Lujan left in a blue Ford Sport Track with Snipes driving to go buy more marijuana. Snipes drove them to the victim's house, although the defendant did not know who lived in the house or who the victim was; he just thought they were going to buy marijuana.

Snipes parked the truck, and the defendant and Snipes got out and walked toward the house. Snipes was armed with a .25 caliber automatic. The defendant lagged behind, and his vision of Snipes was blocked by a fence. When he walked around the fence, he saw that Snipes was not at the victim's front door, so he walked toward the back of the house. He was about to knock on the sliding glass door when Snipes came running down the hallway yelling for him to run. The defendant grabbed a BB gun that was sitting next to the sliding glass door and ran toward the truck. When he was about five or ten feet from the truck, he "heard a couple of gunshots and . . . heard a guy scream and . . . heard James Snipes yell for [his] help." He ran back to help his friend and saw Snipes and the victim "tussling on the ground in front of the van." Snipes was standing up and the victim was on his knees with one arm wrapped around Snipes's legs and holding a pistol in his other hand. The two were fighting over the gun, but the defendant did not know at that time to whom the gun belonged. He saw blood on Snipes's stomach and shorts, so he screamed. The victim looked at him, and, thinking the victim had shot Snipes, he shot the victim one time.

The defendant and Snipes ran to the truck and drove Lujan back to their other friend's house. He did not call the police because he was scared and intoxicated. He also felt bad for shooting the victim after he learned that Snipes

was not hurt. They continued to drive around "getting high" and then drove back by the scene at the victim's house. Two police cars were in the area and, when Snipes saw them, he made a sharp right turn and sped away. The police gave chase, but the pursuit ended when their vehicle was hit by another car at a traffic signal. Snipes got out of the truck and ran, but the defendant remained because he was intoxicated and felt that he had not done anything wrong. The defendant denied using a weapon at any time during the pursuit.

The defendant was arrested at the scene and taken to the police station. Because he was too intoxicated to give a statement that night, he was put on a hold and taken to a cell. The next morning, he was taken to the homicide office and eventually gave two statements, neither of which was entirely accurate, due to Sergeant Max's telling him that he would get the death penalty. Prior to giving the statements, he had twice requested an attorney. On cross-examination, the defendant admitted that "[t]here's a chance" he yelled for the officers to return to the interview room after they left the first time.

After the conclusion of the proof, the jury convicted the defendant of first degree felony murder, the lesser-included offense of second-degree murder, aggravated burglary, and employing a firearm during the commission of a felony.

*Smith*, 2012 WL 4372547, at *1–*7.

As for the hearing on Petitioner's post-conviction, again this Court will reference the

TCCA opinion on that appeal to summarize the evidence presented at the post-conviction

hearing and the decision of the post-conviction trial court.

Trial counsel, an Assistant Shelby County Public Defender for seven years, testified that he was assigned the petitioner's case in 2007. Counsel had previously tried two first degree murder cases and assisted in the prosecution of at least three others. Counsel recalled meeting with the petitioner and his family on several occasions to discuss potential witnesses and possible defenses. Through discovery, he received a statement from the petitioner's co-defendant Jesus Lujan, which reflected that Lujan was in the car when they arrived at the victim's house, but he remained in the car "with the radio blaring loudly" during the altercation between the victim and the petitioner. Because Lujan's statement reflected that he remained in the car during the incident, counsel decided not to send investigators to get an additional statement from Lujan or to call him as a witness at trial. When pressed on this point, counsel admitted that his primary defense at trial was voluntary intoxication and that he knew Lujan could testify to the petitioner's level of intoxication because Lujan had been with the petitioner during the hours preceding the altercation with the victim. Counsel believed that he had sufficient evidence of the petitioner's intoxication based on the petitioner's

testimony of his extensive drug use prior to the altercation and the testimony elicited on cross-examination from the arresting officer that, at the time of the arrest, the petitioner was too intoxicated to give a statement.

Trial counsel was also aware that three women were in the vehicle with the petitioner when he was arrested and had received their statements in discovery. Counsel made "a strategic choice" not to get follow-up statements or to call the women as witnesses at trial. Counsel met with the petitioner's sister, Madison Molina, on multiple occasions prior to trial, but did not recall whether she encouraged him to call Lujan as a witness. Counsel additionally made "a strategic choice" not to give a more detailed opening statement. He testified that he considered giving a more detailed opening statement, but determined that it was in the client's best interest to hear the State's proof first.

Madison Molina, the petitioner's sister, testified that she saw the petitioner in the late afternoon of the day prior to the shooting. When she saw the petitioner, "He was out of his mind. He was so intoxicated." After the petitioner's arrest, Molina visited Lujan in jail and learned that the petitioner had continued to take drugs through the night and into the following morning prior to the shooting. Lujan also told her that the petitioner never planned to rob anyone and that they just went to the victim's house to buy more marijuana. Molina relayed this information to trial counsel and told him that both she and Lujan would be willing to testify at trial. However, trial counsel told her that, "he just couldn't use [Lujan] in the case."

At the conclusion of the hearing, the post-conviction court took the matter under advisement and subsequently issued a written order denying relief on January 15, 2015. In the order, the court found that the petitioner failed to establish that trial counsel was deficient for failing to call Lujan as a witness at trial because the petitioner failed to present testimony from Lujan at the post-conviction hearing as required by *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The post-conviction court also determined that trial counsel made a strategic decision not to call the petitioner's sister and that it was in the petitioner's best interest. Regarding the three witnesses that were with the petitioner when he was arrested, the post-conviction court determined that trial counsel was not deficient for failing to interview them because he already had a copy of their statements to police and their testimony was not relevant to trial counsel's theory of the case. Finally, the post-conviction court determined that trial counsel gave an adequate opening statement that fell "well within the accepted standards for those practicing within the profession."

*Smith*, 2016 WL 3345247, at *3–*4.

Now the Court will turn to the federal issues and start with the legal standards that apply here.

**LEGAL STANDARDS**

Federal courts have authority to issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

I.      **Exhaustion and Procedural Default**

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting to the state courts the same claim the prisoner brings in a federal habeas court. 28 U.S.C. § 2254(b)–(c); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). Indeed, the petitioner must "fairly present"[2] each claim to all levels of state court review, up to the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), unless the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999). Following this directive, Tennessee eliminated the need to seek review in the Tennessee Supreme Court to meet the requirements of exhausting all available state remedies. Tenn. Sup. Ct. R. 39; *see also*, *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

---

[2] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, like a procedural rule prohibiting the state court from deciding the merits of the constitutional claim, the procedural default doctrine ordinarily bars a petitioner from seeking federal habeas review of that claim. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment") (internal quotation marks and citation omitted).[3] In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If a petitioner is barred from asserting a claim under the procedural default doctrine, the petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation or that a failure to review the claim would lead to a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The latter showing requires a petitioner to establish that a constitutional error has probably caused the conviction of a person who is innocent of the crime.

---

[3] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. at 60-61 (2009)). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Kindler*, 558 U.S. at 54.) (internal quotation marks and citations omitted).

*Schlup*, 513 U.S. at 321; *see also House v. Bell*, 547 U.S. 518, 536–539 (2006) (restating the ways to overcome procedural default and further explaining the actual innocence exception).

## II.    Merits Review

Under Section 2254(d), where a state court addressed a claim on the merits, a federal court should grant a habeas petition only if the state court resolution of the claim:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2). Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt." *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Cullen*, 563 U.S. at 182. A state court's decision is "contrary" to federal law when it "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A state court makes an "unreasonable application" of federal law when it "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 412–13. The state court's application of clearly established federal law must be more than just mistaken—it must be "objectively unreasonable" for the writ to issue. *Id.* at 409. The federal court may not issue a writ just

14

because the habeas court, "in its independent judgment," determines that the "state court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

There is minimal case law addressing whether, under § 2254(d)(2), a state court based its decision on "an unreasonable determination of the facts." In *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court noted that a state-court's factual determination is not "unreasonable" just because the federal habeas court would have reached a different conclusion.[4] In *Rice v. Collins*, 546 U.S. 333 (2006), the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." *Rice*, 546 U.S. at 341–42.

The Sixth Circuit described the § 2254(d)(2) standard as "demanding but not insatiable" and even emphasized that, under § 2254(e)(1), the federal court presumes that the state court's factual determination is correct absent clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010). In the end, a federal court will not overturn a state court adjudication on factual grounds unless it is objectively unreasonable given the evidence presented during the state court proceeding. *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011).

---

[4] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299. The Court found it unnecessary to reach that issue, and left it open "for another day". *Id.* at 300–01, 303 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006), in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inaplicable).

### III. Ineffective Assistance of Counsel

In *Strickland v. Washington*, the Supreme Court established the standard by which courts analyze a claim that ineffective assistance of counsel has deprived a defendant of his Sixth Amendment right to counsel. See 466 U.S. 668, 687 (1984). To succeed on this claim, a petitioner must prove two elements: 1) that counsel's performance was deficient, and 2) "that the deficient performance prejudiced the defense." *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a person challenging a conviction "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To show prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[5] "A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* at 694. It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [*Strickland*,] at 693. Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.*, at 687." *Harrington*, 562 U.S. at 104 (citing *Strickland*); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per

---

[5] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Strickland*, 466 U.S. at 697.

curiam) ("But *Strickland* does not require the State to 'rule out'" a more favorable outcome to

prevail. "Rather, *Strickland* places the burden on the defendant, not the State, to show a

'reasonable probability' that the result would have been different.").

Even more, federal courts reviewing an ineffective assistance claim accord a state-court

decision higher deference under 28 U.S.C. § 2254(d). The Supreme Court made this point

emphatically.

> Establishing that a state court's application of *Strickland* was unreasonable under
> § 2254(d) is all the more difficult. The standards created by *Strickland* and §
> 2254(d) are both "highly deferential," *id.*, at 689; *Lindh v. Murphy*, 521 U.S. 320,
> 333, n.7 (1997), and when the two apply in tandem, review is "doubly" so,
> *Knowles* [*v. Mirzayance*], 556 U.S., at 123, 129 S. Ct. at 1420 [(2009)]. The
> *Strickland* standard is a general one, so the range of reasonable applications is
> substantial. 556 U.S., at 123, 129 S. Ct. at 1420. Federal habeas courts must
> guard against the danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d). When § 2254(d) applies, the question is not
> whether counsel's actions were reasonable. The question is whether there is any
> reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

"There is no constitutional right to an attorney in state post-conviction proceedings.

Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such

proceedings." *Coleman*, 501 U.S. at 752 (internal citations omitted). Attorney error cannot

constitute "cause" for a procedural default "because the attorney is the petitioner's agent when

acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of

attorney error." *Id.* at 753 (internal quotation marks omitted). When the State has no

constitutional obligation to ensure that a prisoner is represented by competent counsel, the

petitioner bears the risk of attorney error. *Id.* at 754.

In 2012, the Supreme Court decided *Martinez v. Ryan*, 566 U.S. 1 (2012) which

recognized a narrow exception to the rule in *Coleman*, "[w]here, under state law, claims of

ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." *Martinez*, 566 U.S. at 17. In those cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* What is more, the Supreme Court emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here. . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* The requirements that a petitioner must satisfy to excuse a procedural default under *Martinez* are

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis and alterations in original).

In *Martinez*, the Supreme Court considered an Arizona law that did not permit petitioners to raise ineffective assistance claims on direct appeal. *Martinez*, 566 U.S. at 4. Later in *Trevino*, 569 U.S. at 429, the Supreme Court extended its holding in *Martinez* to states with a "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." *Trevino* modified the fourth *Martinez* requirement for overcoming a procedural default. The holdings in *Martinez* and *Trevino* apply to Tennessee prisoners. *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

Now the Court will turn to the analysis of Petitioner's claims here.

## III.    Petitioner's Federal Habeas Claims

In the second amended § 2254 petition, Smith raises these issues[6]:

1.    Trial counsel performed deficiently by failing to:

    (a)    call his sister, Madison Molina, as a witness at trial (Second Am. Pet., ECF No. 10 at PageID 232);

    (b)    call co-defendant Jesus Lujan as a witness at trial (*id*);

    (c)    interview the three women who were with Petitioner when he was arrested (*id.*);

    (d)    give a more detailed opening statement (*id.*);

2.    Post-conviction counsel performed deficiently by failing to raise the following claims of ineffective assistance of trial counsel.  Trial counsel's failure to:

    (a)    suppress Petitioner's statements to police by obtaining a videotape of his interviews (*id.* at PageID 255);

    (b)    present expert and eyewitness testimony to support the defense theory of voluntary intoxication, lack of intent, and that Petitioner did not point a pistol at officers (*id.* at 258);

    (c)    challenge the indictment as defective (*id.* at PageID 259–60);

    (d)    challenge the enhanced punishment sought by the State (*id.*);

    (e)    raise a collateral estoppel claim (*id.* at PageID 262–66);

3.    The trial court erred by denying Petitioner's motion to suppress (*id.* at PageID 239–40);

4.    The evidence was insufficient to convict Petitioner of first-degree felony murder (*id.* at PageID 241–43); and

---

[6] The Court has reorganized and renumbered the issues for ease of analysis.

19

5.      The trial judge's instruction on defense of others was erroneous (*id.* at PageID 244–45).

Petitioner raised Issues 1(a)–(d) and the substance of Issue 2(c) to the TCCA in the post-conviction appeal.  (R., Brief ("Br.") of Appellant, ECF No. 14-23 at PageID 1585.)  And he presented Issues 3–5 to the TCCA on direct appeal.  (R., Br. of the Appellant, ECF No. 14-14 at PageID 1360.)  Petitioner Smith concedes that he never presented Issues 2(a)–(b) and 2(d)–(e) for review by the TCCA.

## IV.      Analysis of Petitioner's Claims

### A.      Issues of Ineffective Assistance of Trial Counsel

#### 1.      Issues 1(a)–(c).  Did trial counsel perform deficiently by failing to call Madison Molina, Jesus Lujan, and the three women who were present at his arrest as witnesses at trial?

Smith contends that trial counsel's failure to call potential witnesses—Madison Molina, Jesus Lujan, and the three women who were in the car when the police caught him—was deficient representation.  He says the uncalled witnesses could have testified about his intoxication before, during, and after the crime.  (Second Am. Pet., ECF No. 10 at PageID 232–36.)  Smith alleges that the three women could have testified that he did not point a gun at officers during the car chase.  (*Id.* at 233.)  In contrast, Respondent argues persuasively that the decision of the TCCA addressing Petitioner's claims does not contradict or unreasonably apply *Strickland* and is not based on an unreasonable determination of the facts.  (Answer, ECF No. 15 at PageID 1735–37.)

The TCCA identified the proper standard for analyzing the claim of ineffective assistance of counsel, *Strickland*, 466 U.S. at 687.  *Smith*, 2016 WL 3345247, at *4–*5.  After reviewing

the evidence presented at the post-conviction hearing and the post-conviction court's

determination, the TCCA opined:

> The petitioner argues that trial counsel was ineffective for failing to call Madison Molina and Jesus Lujan as witnesses at trial and for failing to investigate three women that were with the petitioner when he was arrested. The State argues that the petitioner cannot establish deficient performance or prejudice regarding Lujan or any of the women that were with the petitioner prior to his arrest because they did not testify at the post-conviction hearing. Regarding Molina, the State claims that the decision not to call her as a witness was a reasonable strategic decision by trial counsel.

> The post-conviction court concluded, and we agree, that counsel was not ineffective for failing to call Molina at trial. Trial counsel's trial strategy was that the State could not prove the element of intent because the petitioner was too intoxicated at the time of the crime. In support of this theory, he presented testimony from the petitioner and one of the arresting officers that the petitioner was too intoxicated at the time of his arrest to give a statement. Trial counsel decided not to call Molina because he believed the testimony from the petitioner and the arresting officer was sufficient to warrant a jury instruction on intoxication. The post-conviction court credited the testimony of counsel and determined that trial counsel's decision was strategic and did not amount to deficient performance. The evidence does not preponderate against the finding of the post-conviction court. Accordingly, the petitioner is not entitled to relief on this issue.

> The petitioner has also failed to establish that trial counsel rendered ineffective assistance by failing to call Lujan or the three women that were with the petitioner when he was arrested because the petitioner did not call them as witnesses at the post-conviction hearing. *See Black*, 794 S.W.2d at 757 ("When a petitioner contends that trial counsel failed to . . . present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing. . . . this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner."). Citing *Tavarus U. Williams v. State*, No. 02C01–9711–CR–00423, 1998 WL 742348 (Tenn.Crim.App., at Jackson, Oct. 23, 2009), the petitioner argues that the rule in *Black* is inapplicable because his sister testified at the post-conviction hearing regarding the substance of what Lujan would have testified to at trial.

> In *Tavarus Williams*, this court determined that trial counsel's negligence prevented the petitioner from calling the missing witness at the post-conviction

hearing and therefore reversed the post-conviction court's denial of relief. The court reasoned:

> We recognize that this witness' proposed testimony should have been produced at the post-conviction hearing under the general rule announced in *Black v. State*. However, we think it is fundamentally unfair to hold this failure of proof against [Williams] and, therefore, find the *Black* rule inapplicable under the facts of this case . . .

> The best evidence that [Williams] had of the crucial testimony was [the investigator], and he did produce that proof at the hearing. Accordingly, because [Williams] produced independent proof of vital testimony that would have been available at the hearing but for his trial lawyer's ineffectiveness (in never discovering the witness, not calling him and losing all record of him), we hold that [Williams] has established both prongs of the *Strickland* test.

*Id.* at *6–7 (internal citations, footnotes, and quotations omitted).

> *Tavarus Williams* is distinguishable from the case at bar. First, the petitioner does not allege or present proof that he was unable to produce the prospective witnesses at the post-conviction hearing based on trial counsel's negligence. The petitioner offered no explanation for his failure to produce these witnesses at the hearing. Moreover, in contrast to *Tavarus Williams*, trial counsel knew of these potential witnesses through the course of his investigation, had received their statements during discovery, and made a strategic choice not to use them at trial. Accordingly, the circumstances of this case do not implicate the concerns of fundamental fairness espoused in *Tavarus Williams*. The petitioner is not entitled to relief on this issue.

*Smith v. State*, 2016 WL 3345247, at *5–*6.

Petitioner Smith fails to explain how the decision of the TCCA differed from *Strickland*. Instead, he repeats the same argument he made to the TCCA during the post-conviction appeal. (Second Am. Pet., ECF No. 10 at PageID 232–36; R., Br. of Appellant, ECF No. 14-23 at PageID 1592–1607.) Petitioner has not satisfied his burden of showing that the decision was objectively unreasonable. He fails to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

U.S. at 694. Petitioner also fails to provide argument or evidence that overcomes the presumption of correctness given the state court's factual determination. A state court's factual findings are entitled to a presumption of correctness absent clear and convincing evidence to the contrary. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1). That presumption stands here.

Based on this Court's review of the transcript of Petitioner's post-conviction hearing, (R., Post-Conviction Hearing ("Hr'g.") Transcript ("Tr."), ECF No. 14-20) and the transcript of Petitioner's trial (R., Trial Tr., ECF Nos. 14-5, 14-6, 14-7, 14-8), this Court holds the TCCA's factual determination was not an unreasonable one. The Court will take each proposed witness in turn.

First, Petitioner's sister, Madison Molina, testified at the post-conviction hearing that she had seen Petitioner in the afternoon the day before he committed the crime. (Post-Conviction Hr'g. Tr., ECF No. 14-20 at PageID 1560.) Her testimony was of little use. Molina also testified that she spoke with Lujan after his arrest and that he agreed to help with Smith's trial. (*Id.* at PageID 1559.) Petitioner argues that Lujan was willing to testify if called and that he would have given favorable testimony for the defense. (Second Am. Pet., ECF No. 10 at PageID 233.) Yet Lujan, himself, did not testify at the post-conviction hearing and Petitioner gave no explanation for his absence.

Second, as for Lujan's testimony. Trial counsel testified that Lujan was a codefendant and "[Lujan] had given a statement [] that I was provided. And in the statement [Lujan] told the police that all he knew was that he was in the car with the radio blaring loudly. And that's all [Lujan] knew of the entire situation." (R., Post-Conviction Tr., ECF No. 14-20 at PageID 1532.) Besides, the main point Petitioner wanted to glean from Lujan's testimony was that Petitioner was intoxicated during the criminal acts, but trial counsel pointed out that both Petitioner and a

police officer testified at trial that Petitioner was intoxicated, so counsel chose not investigate Lujan further.  (*Id.* at PageID 1532–34.)

Third, trial counsel testified that he had statements from the three women in the car when officers arrested Smith and decided not to call them as witnesses because his plan at trial was to aim the responsibility for the crimes on co-defendant Snipes and focus his proof on Petitioner's intoxication.  (*Id.* at PageID 1536–38.)

Molina's testimony would not have substantially aided the jury's determination of Smith's level of intoxication on the day of the crime because she saw him the day before.  The Court is left to guess what specific testimony Lujan and the three women might have offered.  Conclusory allegations about the testimony of uncalled witnesses are not enough to show prejudice.  *See United States v. Vargas*, 920 F. 2d 167, 169–70 (2d Cir. 1990); *Adams v. Jago*, 703 F.2d 978, 981 (6th Cir. 1983).  Petitioner's conjecture about Lujan's testimony and the unnamed female passengers do not rebut trial counsel's strategic decision to not call them as witnesses.  Deference to the state court decision on this issue is appropriate.  For these reasons, this Court DENIES Petitioner's Issues 1(a)–(c) because they lack merit.

> ## 2. Issue 1(d).  Was trial counsel's performance deficient because he failed to give a more detailed opening statement?

Smith contends that trial counsel should have given a more detailed opening statement. (Second Am. Pet., ECF No. 10 at PageID 236–41.)  Respondent replies that Petitioner argued this same point to the TCCA, and the TCCA's decision on that issue is not contrary to or an unreasonable application of *Strickland* and that decision is not based on an unreasonable determination of the facts.  (Answer, ECF No. 15 at PageID 1738.)  Respondent's position is again persuasive.

The TCCA analyzed the claim of ineffective assistance of counsel under *Strickland*, 466

U.S. at 687, reviewed the evidence and the post-conviction court's determination, and opined:

> Next, the petitioner claims that trial counsel was ineffective for failing to give a more detailed opening statement. Specifically, he contends that trial counsel should have made more of an effort to "advance the defense theory of the case." The State responds that the post-conviction court properly determined that trial counsel's opening statement was not deficient. We agree with the State.

> The right to effective assistance of counsel extends to opening and closing arguments. *Yarborough v. Gentry*, 540 U.S. 1, 5–7 (2003); *Bell v. Cone*, 535 U.S. 685, 701–02 (2002). However, counsel has wide latitude in deciding how to best represent a client, and deference to counsel's tactical decisions in the opening statement or closing argument is particularly important. *Kevin Lewis v. State*, No. E2014–02070–CCA–R3–PC, 2015 WL 5175664, at *5 (Tenn.Crim.App. Sept. 3, 2015), *perm. app. denied* (Tenn. Dec. 11, 2015) (citing *Torrez Talley v. State*, No. W2009–02036–CCA–R3–PC, 2011 WL 1770485, at *4 (Tenn.Crim.App. May 9, 2011), *perm. app. denied* (Tenn. Sept. 21, 2011)).

> We agree with the post-conviction court's determination that trial counsel was not ineffective for not making a more detailed opening statement. While trial counsel gave a relatively brief opening statement, he testified at the post-conviction hearing that the decision to do so was a strategic one. During his opening statement, trial counsel instructed the jury that the burden of producing proof of guilt beyond a reasonable doubt was on the State and asked the jurors to keep an open mind throughout the proceedings. As we have previously noted, this court will not second guess strategic decisions of trial counsel, including decisions regarding the length or content of the opening statement. *See James Richard Bishop v. State*, No. E2000–01725–CCA–R3–PC, 2001 WL 798065, at *9 (Tenn.Crim.App. July 13, 2001) (citing *Aaron Jermaine Walker v. State*, No. 03C01–9802–CR–00046, 1999 WL 39511 (Tenn.Crim.App., at Knoxville, Jan. 28, 1999), *perm. app. denied* (Tenn. July 12, 1999)) (noting that even the complete waiver of an opening statement "has been held to be a valid strategy decision, whether or not ultimately successful or even wise when viewed in hindsight"). The petitioner is not entitled to relief on this issue.

*Smith v. State*, 2016 WL 3345247, at *6.

Here Petitioner repeats the same argument he made to the TCCA in his post-conviction

appeal. (Second Am. Pet., ECF No. 10 at PageID 236–38; R., Br. of Appellant, ECF No. 14-23

at PageID 1608–10.) He failed in state court and he fails here to show "a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Petitioner has not satisfied his burden of showing that the decision was objectively unreasonable. Petitioner also fails to assert an argument or evidence that overcomes the presumption of correctness this Court gives to the state court's factual determination. A state court's factual findings are entitled to a presumption of correctness absent clear and convincing evidence to the contrary. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1).

Although trial counsel could have chosen to describe explicitly Smith's theory of the case in the opening statement, courts do not consider his decision not to do so constitutionally deficient because an attorney's choice not to make an opening statement at all "is ordinarily a mere matter of trial tactics and . . . will not constitute . . . a claim of ineffective assistance of counsel." *Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004) (alteration in original) (quoting *Millender v. Adams*, 187 F. Supp. 2d 852, 870 (E.D. Mich. 2002)).

Based on this Court's review of the transcript of Petitioner's post-conviction hearing, (R., Post-Conviction Hr'g. Tr., ECF No. 14-20) and the transcript of Petitioner's trial (R., Trial Tr., ECF Nos. 14-5, 14-6, 14-7, 14-8), this Court finds that the TCCA's determination was a reasonable application of *Strickland*.

For these reasons, this Court DENIES Petitioner's Issue 1(d).

> **3.     Issue 2(a).  Did trial counsel perform deficiently by failing to obtain and use a videotape of Petitioner's statements for use in the motion to suppress?**

Smith contends that trial counsel could have "obtained the video[tape of his interviews] to rebut the State's position of how the events supposedly took place." (Second Am. Pet., ECF No. 10 at PageID 255.) Respondent counters that, because Petitioner did not raise this issue in state court, he is barred from raising it now under the procedural default doctrine. (Answer, ECF

No. 15 at PageID 1751–52.)  Petitioner contends that this court should excuse the procedural

default of this claim because of ineffective assistance of post-conviction counsel.  (Second Am.

Pet., ECF No. 10 at PageID 256.)

Ineffective assistance of state post-conviction counsel can establish cause to excuse a

Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial

counsel was constitutionally ineffective.  *Sutton*, 745 F.3d at 787.  To qualify as "substantial"

under *Martinez*, a claim must have "some merit" based on the controlling standard for ineffective

assistance of counsel.  *Martinez*, 566 U. S. at 14.

Petitioner's contention is not persuasive here because he has introduced no videotape nor

any exhibit showing that a videotape of his interviews exists now or ever existed.  To this point,

Lieutenant Walter Davidson testified at trial that the large interview room where officers

interviewed Petitioner did not have audio or video recording equipment.  (R., Trial Tr., ECF No.

17-7 at PageID 1050.)  Instead, they had only a video monitor in Lieutenant Davidson's office

for officers to view the detainee in the interview room when the interviewing officers stepped

out.  (*Id.*)  Because Smith provides no affidavits or other evidence in support of his position, he

has not shown that the trial court would have changed its ruling on the motion to suppress or that

this claim has any merit.  Petitioner's speculation and conclusory statements are not evidence

and they are not enough to establish ineffective assistance of counsel under *Martinez*.  Petitioner

therefore has not established a basis to excuse the procedural default of this issue.  As a result,

this Court DENIES Petitioner's Issue 2(a).

**4.    Issue 2(b).  Did trial counsel perform deficiently by failing to present expert testimony to support the defense theory of involuntary intoxication?**[7]

Petitioner next contends that trial counsel should have introduced expert testimony to prove to the jury that Petitioner's intoxication prevented him "from forming the culpable mental state for the charged offense."  (Second Am. Pet., ECF No. 10 at PageID 258.)  Respondent answers that because Petitioner failed to present this issue to the trial court, he is barred from raising this issue here under the procedural default doctrine.  (Answer, ECF No. 15 at PageID 1751–52.)  Petitioner argues that this Court should excuse his default of this claim because of the ineffective assistance of post-conviction counsel.  (Second Am. Pet., ECF No. 10 at PageID 256.)

Petitioner again speculates that expert testimony would have been valuable proof of his inability to form the requisite intent for his crime, but he fails to support his speculation with evidence such as an expert affidavit.  The Court must then guess what specific testimony an expert might have offered.  Petitioner asks this Court to second guess trial counsel's strategic decision to call Petitioner and a police officer to testify about his intoxication with no more than

---

[7] Petitioner included factual allegations about counsel's failure to call witnesses Lujan, Molina, and the three unidentified women to establish his level of intoxication.  (Second Am. Pet., ECF No. 10 at PageID 257.)   This Court addressed the aspect of this issue properly exhausted in the post-conviction proceeding *supra* at pp. 20–25.  If Smith contends that post-conviction counsel provided ineffective assistance by failing to produce these witnesses during post-conviction proceedings, by statute, the ineffective assistance of post-conviction counsel does not constitute grounds for habeas relief.  28 U.S.C. § 2254(i).  Even if that were not the case, the Supreme Court has long held that "[t] here is no right to counsel in state post-conviction proceedings" and therefore no right to effective postconviction counsel.  *Coleman*, 501 U.S. at 752 (citations omitted).  *Martinez and Trevino* did not abrogate that rule.  Rather, the Supreme Court recognized that the ineffective assistance of post-conviction counsel may, in few circumstances, provide "cause" for the procedural default of a claim of ineffective assistance of trial counsel. *Martinez*, 566 U.S. at 8–16.  Smith's claim of ineffective assistance of post-conviction counsel does not provide a cognizable ground for habeas relief and is **DENIED**.

speculation that his trial counsel should have retained an expert.  These conclusory and

speculative allegations about the testimony of uncalled witnesses—expert witnesses—cannot

establish prejudice.  Petitioner has not established a substantial claim of ineffective assistance of

counsel nor has he shown that an expert would have buttressed his defense or led to a different

outcome at trial.  In short, as for Petitioner's Issue 2(b), this Court DENIES this claim.

### 5. Issue 2(c).  Did trial counsel perform deficiently by failing to challenge the indictment as defective?

Petitioner claims that trial counsel should have challenged the count of the indictment

charging him with employing a firearm during the commission of a dangerous felony because it

failed to specify that felony.  (Second Am. Pet., ECF No. 10 at PageID 259.)  In response,

Respondent asserts that this issue lacks merit because the TCCA addressed this issue during the

post-conviction appeal and it did not misapply clearly established federal law.  (Answer, ECF

No. 15 at PageID 1755.)  Respondent also argues that this claim of ineffective assistance of

counsel fails to establish prejudice or that it is substantial claim of ineffective assistance.  (*Id.* at

PageID 1754.)

Petitioner raised the substance of this claim in the post-conviction appeal.  Addressing

this issue, the TCCA opined:

> Finally, the petitioner challenges the sufficiency of count six of his
> indictment, which charges him with employing a firearm during the commission
> of dangerous felony.  The petitioner claims for the first time on appeal that his
> firearm conviction should be vacated because he was deprived of adequate notice
> when the State failed to specify the underlying dangerous felony.  The State
> responds that the issue is meritless because notice pleading requirements do not
> require the specific pleading of a predicate felony when a defendant is charged
> with employing a firearm during the commission of a dangerous felony.

> As an initial matter, the petitioner concedes that this issue was not raised
> in his petition for post-conviction relief and is being argued for the first time on
> appeal.  Normally, challenges to an indictment must be raised pre-trial; however,

a defendant can challenge the indictment at any time while the case is pending when challenging the lack of subject matter jurisdiction in the court or when alleging that the indictment failed to charge an offense. *See* Tenn. R. Crim. P. 12(b)(2)(B); *State v. Nixon*, 977 S.W.2d 119, 120–21 (Tenn. 1997); *Rogers v. State*, No. E2015–00255–CCA–R3–PC, 2015 WL 4511551, at *3 (Tenn.Crim.App. July 27, 2015); *State v. Alvin Brewer and Patrick Boyland*, Nos. W2012–02281–CCA–R3–CD and W2012–02282–CCA–R3–CD, 2014 WL 1669807, at *26 (Tenn.Crim.App. Apr. 24, 2014) ("An allegation that an indictment does not charge an offense is . . . subject to plenary review even if not raised in the trial court."), *perm. app. denied* (Tenn. Sept. 18, 2014); *State v. Willie Duncan*, No. W2013–02554–CCA–R3–CD, 2014 WL 4243746, at *5 (Tenn.Crim.App. Aug. 27, 2014) (citing *Alvin Brewer*, 2014 WL 1669807, at *26), *perm. app. granted* (Tenn. Feb. 13, 2015); *see also Dykes v. Compton*, 978 S.W.2d 528, 529 (Tenn. 1998) (citations omitted) (holding that a defective indictment claim may be brought in a habeas corpus proceeding because "[a] valid indictment is an essential jurisdictional element, without which there can be no prosecution"). In addition, the State concedes that the petitioner may raise this issue for the first time on post-conviction review. Therefore, we will address the merits of the petitioner's arguments.

Pursuant to Code section 39–17–1324, it is an offense to employ a firearm during the commission or attempted commission of a dangerous felony. T.C.A. 39–17–1324(b)(1), (2). The statute provides a list of eleven qualifying predicate felonies and requires that the underlying felony "be pled in a separate count of the indictment or presentment and tried before the same jury at the same time as the dangerous felony." *Id.* § 39–7–1324(d). However, the statute is silent on whether the predicate dangerous felony must be named in the count charging a violation of Code section 39–17–1324. *Willie Duncan*, 2014 WL 4243746, at *6.

The United States Constitution and the Tennessee Constitution state that a defendant is entitled to knowledge of "the nature and cause of the accusation." U.S. Const. amend. VI; Tennessee Const. art. I, § 9. The Tennessee Supreme Court has stated that an indictment is valid if it contains sufficient information "(1) to enable the accused to know the accusation to which answer is required, (2) to furnish the court adequate basis for the entry of a proper judgment, and (3) to protect the accused from double jeopardy." *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997) (citing *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991); *VanArsdall v. State*, 919 S.W.2d 626, 630 (Tenn.Crim.App. 1995); *State v. Smith*, 612 S.W.2d 493, 497 (Tenn.Crim.App. 1980)). In addition, pursuant to Tennessee Code Annotated section 40–13–202, the indictment must

state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner so as to enable a person of common understanding to know what is

intended, and with that degree of certainty which will enable the
court, on conviction, to pronounce the proper judgment. . . .

T.C.A. § 40–13–202; *see also State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn.
2000) (citing *State v. Hill*, 954 S.W.2d at 727) (stating that "achiev[ing] the
overriding purpose of [providing] notice to the accused will be considered
sufficient to satisfy both constitutional and statutory requirements.")).  A
challenge to the sufficiency of an indictment presents a question of law which we
review de novo.  *State v. Wilson*, 31 S.W.3d 189, 191 (Tenn. 2000).

As it relates to Tennessee Code Annotated section 39–17–1324, generally
an indictment "that does not name the underlying dangerous felony does not
provide the defendant with adequate notice of the crime charged," because there
are eleven qualifying dangerous felonies listed in the statute, and the failure to
specify one "leaves the defendant with inadequate notice of the charges against
him."  *State v. Demeko Gerard Duckworth*, No. M2012–01234–CCA–R3–CD,
2013 WL 1933085, at *21 (Tenn.Crim.App. May 10, 2013), *perm. app. denied*
(Tenn. Oct. 17, 2013); T.C.A. § 39–17–1324(h)(2)(i)(1).  However, if each count
of the indictment, read together, leaves the defendant "reasonably certain of the
predicate felony underlying a conviction for employing a firearm during the
commission of a dangerous felony," the indictment is valid.  *Willie Duncan*, 2014
WL 4243746, at *7 (citing *Alvin Brewer*, 2014 WL 1669807, at *30).

Despite the failure to specify the underlying predicate felony in the
indictment, the indictment is not void for lack of notice because only one
qualifying predicate felony was charged.  Under these circumstances, this court
has consistently held that the indictment served its "overriding purpose" of
providing notice to the defendant.  *See State v. Narrell Christopher Pierce*, No.
M2014–00120–CCA–R3–CD, 2015 WL 2102003, at *15 (May 5, 2014) ("where
the indictment . . . includes only one count that qualifies as a dangerous felony
under section 39–17–1324, the indictment is not void for lack of notice."), *perm.
app. denied* (Tenn. Aug. 13, 2015); *see also State v. Rhakim Martin*, No. W2013–
02013–CCA–R3–CD, 2015 WL 555470, at *7–8 (Tenn.Crim.App. Feb. 10, 2015)
(holding that although dangerous felony was not specified in the indictment,
defendant was provided adequate notice when the remaining counts charge only
one dangerous felony specified in section 39–17–1324), *perm. app. granted*
(Tenn. May 15, 2015); *State v. Christopher Swift and Marquavious Houston*, No.
W2013–00842–CCA–R3–CD, 2015 WL 2128782, at *18 (Tenn.Crim.App. May
5, 2015) (failure to specify the predicate felony did not void indictment where
only other indicted offense "qualified as a dangerous felony pursuant to
Tennessee Code Annotated section 39–17–1324(i)(1)"); *State v. Zachary Carlisle*,
No. W2012–00291–CCA–MR3–CD, 2013 WL 5561480, at *16 (Tenn.Crim.App.
Oct. 7, 2013) ("Voluntary manslaughter is listed as a 'dangerous felony in . . .
section 39–17–1324(i)(1), and was the only other offense charged in the
indictment . . . the indictment provided the Defendant with adequate notice of the

dangerous felony he was charged with committing while employing a firearm."), *perm. app. denied* (Tenn. Mar. 17, 2014); *Demeko Gerard Duckworth*, 2013 WL 1933085, at *22 (indictment not void for lack of notice because it was "reasonably clear" that the firearm charge was related to the only dangerous felony listed in section 39–17–1324 charged in the indictment); *cf. Willie Duncan*, 2014 WL 4243746, at *9 (concluding that an indictment for employing a firearm during the commission of a dangerous felony without specifying the predicate felony failed to provide adequate notice where the defendant was charged with multiple qualifying dangerous felonies).

We find this reasoning to be persuasive and likewise hold that the indictment in this case is not void for lack of notice. Because aggravated burglary was the only qualifying predicate felony charged in the indictment, it was "reasonably clear" that the firearm charge in this case was related to the aggravated burglary charge. *See* T.C.A. § 39–17–1324(i)(1)(H). Accordingly, the petitioner is not entitled to relief on this issue.

*Smith*, 2016 WL 3345247, at *7–*9.

Here Petitioner reframes the challenge to the indictment as a claim of ineffective assistance of counsel. He contends that the state court "circumvent[ed] the reading of what Tenn. Code Ann. § 39-17-1324(d) requires" and trial counsel was ineffective for failing to pursue this argument. (Second Am. Pet., ECF No. 10 at PageID 260.) In analyzing this claim, the TCCA determined that the indictment was "not void for lack of notice." *Smith*, 2016 WL 3345247, at *8. Now, looking at it as a claim of ineffective assistance, Petitioner fails to show that, had counsel objected in advance or moved to dismiss this count, the trial court would have sustained the objection or granted the motion. This Court finds that Petitioner has not established deficient performance or prejudice by counsel. So he has failed to establish that this is a substantial claim of ineffective assistance under *Martinez*. Because Petitioner fails to meet his burden, this Court DENIES Issue 2(c).

6. **Issue 2(d). Did trial counsel perform deficiently by failing to challenge the enhanced punishment sought by the prosecution?**

This issue is interesting because Petitioner appears confused about his sentence and thinks there is no possibility of parole. He contends that trial counsel failed to challenge the prosecution's "failure to give notice of its intention [to seek a life sentence without the possibility of parole] as required by Tenn. Code Ann. § 39-13-208." (Second Am. Pet., ECF No. 10 at PageID 258.) Respondent replies that Petitioner misconstrues the sentencing statute and that the prosecution did not seek a sentence of life without parole. (Answer, ECF No. 15 at PageID 1754.)

In support of his claim, Petitioner cites Tennessee Code Annotated § 39-13-208 and § 40-35-501(i). (Second Am. Pet., ECF No. 10 at PageID 258.) Tennessee Code Annotated § 39-13-208 states

> (a) Written notice that the state intends to seek the death penalty, filed pursuant to Rule 12.3(b) of the Tennessee Rules of Criminal Procedure, shall constitute notice that the state also intends to seek, as a possible punishment, a sentence of imprisonment for life without possibility of parole.

*Id.* Contrary to Petitioner's claim here, the trial record shows that the State did not seek the death penalty or a sentence of life without parole. Another pertinent statute, Tennessee Code Annotated § 39-13-204 provides:

> (a) Upon a trial for first degree murder, should the jury find the defendant guilty of first degree murder, it shall not fix punishment as part of the verdict, but the jury shall fix the punishment in a separate sentencing hearing to determine whether the defendant shall be sentenced to death, to imprisonment for life without possibility of parole, or to imprisonment for life. The separate sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt, subject to the provisions of subsection (k) relating to certain retrials on punishment.

*Id.* The trial court sentenced Petitioner to life imprisonment.

As for Tennessee Code Annotated § 40-35-501(i), it provides that

(1) There shall be no release eligibility for a person committing an offense, on or after July 1, 1995, that is enumerated in subdivision (i)(2). The person shall serve one hundred percent (100%) of the sentence imposed by the court less sentence credits earned and retained. However, no sentence reduction credits authorized by § 41-21-236 or any other provision of law, shall operate to reduce the sentence imposed by the court by more than fifteen percent (15%).

(2) The offenses to which subdivision (i)(1) applies are:

      (A) Murder in the first degree;
      (B) Murder in the second degree;
      (C) Especially aggravated kidnapping;
      (D) Aggravated kidnapping;
      (E) Especially aggravated robbery;
      (F) Aggravated rape;
      (G) Rape;
      (H) Aggravated sexual battery;
      (I) Rape of a child;
      (J) Aggravated arson;
      (K) Aggravated child abuse;
      (L) Deleted by 2019 Pub.Acts, c. 211, § 3, eff. July 1, 2019.
      (M) Sexual exploitation of a minor involving more than one hundred (100) images;
      (N) Aggravated sexual exploitation of a minor involving more than twenty-five (25) images; or
      (O) Especially aggravated sexual exploitation of a minor.

*Id.*

These statutes do not support Petitioner's argument. The State did not seek a sentence of life imprisonment without the possibility of parole. Nor did the trial court impose a mandatory sentence of life in prison with no possibility of release. (R., Judgment, ECF No. 14-1 at PageID 367.)

Petitioner cites *Lowe-Kelley v. State*, 2016 WL 742180 (Tenn. Crim. App. 2016), as additional support. Petitioner should not rely so heavily on this case. The *Lowe-Kelly* decision explains why his sentence does not conflict with the holding of *Miller v. Alabama*, 567 U.S. 460

34

(2012).[8]  *Lowe-Kelly* explains that the holding of *Miller* is limited to a life sentence *without the possibility of parole* (emphasis in original) and notes that the TCCA has refused to extend *Miller* to other life sentences (citing cases).  *Lowe-Kelly*, 2016 WL 742180, at *8.

Under Tennessee law, inmates sentenced to life imprisonment are eligible for release after fifty-one years.  *See, e. g., Vaughn v. State*, 202 S.W.3d 106, 118–19 (Tenn. 2006) ("[S]ubsection (i) operates . . . to raise the floor from 60% of sixty years . . . to 100% of sixty years, reduced by not more than 15% of eligible credits.") (quoting Tenn. Op. Att'y Gen., No. 97-098 (1997)); *Darden v. State*, No. M2013-01328- CCA-R3-PC, 2014 WL 992097, at *11 (Tenn. Crim. App. Mar. 13, 2014) ("Life imprisonment in Tennessee does not condemn a juvenile offender to die in prison as the life-without parole sentences contemplated by *Miller*.  In Tennessee, a defendant sentenced to life imprisonment must serve 85% of sixty years, or fifty-one years, before becoming eligible for release."), *appeal denied* (Tenn. Mar. 13, 2014); *see also State v. Collins*, No. W2016- 01819-CCA-R3-CD, 2018 WL 1876333, at *20 (Tenn. Crim. App. Apr. 18, 2018 ) ("[T]his court has consistently rejected the claim that a juvenile's mandatory life sentence, which requires service of fifty-one years before release, constitutes an effective sentence of life without parole in violation of *Miller*.") (collecting cases).

Moreover in *Starks v. Easterling*, 659 F. App'x 277, 280–81 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 819 (2017), the Sixth Circuit held that a state-court decision rejecting a prisoner's challenge to his sentence, which precluded him from being considered for parole until he served a term *beyond his life expectancy*, was not contrary to or an unreasonable application of *Miller*.

---

[8] In *Miller v. Alabama*, 567 U.S. 460 (2012), the Supreme Court ruled that a mandatory sentence of life without the possibility of parole for a minor constitutes unconstitutionally cruel and unusual punishment.  The Supreme Court held *Miller* retroactively applies to those who received such a sentence before the *Miller* decision.  *Montgomery v. Louisiana*, 136 S. Ct. 718, 732 (2016).

(emphasis added.)  Here Petitioner has not given this Court factual or legal authority to rule in his favor.  His claim is meritless and cannot qualify as a substantial claim of ineffective assistance.  The Court therefore DENIES Petitioner's Issue 2(d).

### 7.  2(e).  Did trial counsel perform deficiently by failing to raise a collateral estoppel claim?

Citing *Ashe v. Swenson*, 397 U.S. 436 (1970), Petitioner claims that trial counsel was ineffective because he failed to argue that collateral estoppel prevented the State from pursuing a conviction for murder under the felony murder theory.  (Second Am. Pet., ECF No. 10 at PageID 262.)  Respondent replies that Petitioner is barred by the procedural default doctrine from bringing this claim and, in any event, *Ashe* does not apply to Petitioner's case.  (Answer, ECF No. 15 at PageID 1756.)

Petitioner claims that when the jury acquitted him of first-degree premeditated murder, the State could not then pursue a conviction of first-degree murder under a felony murder theory.  (Second Am. Pet., ECF No. 10 at PageID 264.)  The law does not support this claim.  In *United States v. Mask*, 101 F. Supp.2d 673, 683 (W.D. Tenn. 2000), the Court determined that:

> The doctrine of collateral estoppel mandates that once an issue of ultimate fact, necessary to the previous judgment, has been litigated and subject to a valid and final judgment, the same issue cannot be litigated again between the same parties in a future action.  Collateral estoppel applies in both civil and criminal proceedings.  *Ashe v. Swenson*, 397 U.S. 436, 443, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970) (citing *United States v. Oppenheimer*, 242 U.S. 85, 37 S. Ct. 68, 61 L. Ed. 161 (1916)); *United States v. Taylor*, 176 F.3d 331, 336 (6th Cir. 1999).  The Supreme Court has specifically held that the doctrine of collateral estoppel is embodied in the Fifth Amendment's guarantee against double jeopardy.  *Ashe*, 397 U.S. at 446, 90 S. Ct. 1189.  However, collateral estoppel will not apply under the Double Jeopardy Clause where the second prosecution has a lower standard of proof (*i.e.*, a civil proceeding).  *Dowling v. United States*, 493 U.S. 342, 349, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990).  An example of this is a subsequent civil forfeiture proceeding.  *One Lot Emerald Cut Stones v. United States*, 409 U.S. 232, 234–36, 93 S. Ct. 489, 34 L. Ed.2d 438 (1972).

*Id.* *Ashe* does not apply in Petitioner's case because the State did not relitigate any issue of ultimate fact in a future action. Felony murder was a second theory for the prosecution in the same trial so the ruling in *Ashe* does not apply here. Trial counsel's failure to make a baseless argument or objection is not ineffective assistance. This claim has no merit, therefore, Petitioner cannot not satisfy the requirements to overcome the procedural default of this issue. The Court therefore DENIES Petitioner's Issue 2(e).

### B. Issues Exhausted on Direct Appeal

#### 1. Issue 3. Did the trial court err by denying Petitioner's motion to suppress?

Now the Court will turn to Petitioner's exhausted claims. Petitioner asserts that the trial court erred by denying the motion to suppress his confessions because he asserted his Fifth Amendment right to counsel. (Second Am. Pet., ECF No. 10 at PageID 239–40.) In response the State argues that the TCCA decision does not contradict or unreasonably apply *Miranda v. Arizona*, 384 U.S. 436 (1966), and other clearly established federal law. (Answer, ECF No. 15 at PageID 1742.) Plus, the State adds, the TCCA did not base its decision on an unreasonable determination of the facts. (*Id.*)

After reviewing the proof from the evidentiary hearing on the motion to suppress, the TCCA opined:

> The defendant argues that the trial court erred in denying his motion to suppress because his "unequivocal assertion of his Fifth Amendment privilege was not 'scrupulously honored.' "When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression

hearing are upheld unless the evidence preponderates against those findings. *See id.* However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999); *State v. Yeargan*, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The corresponding provision of the Tennessee Constitution states "[t]hat in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily given, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The State has the burden of proving the waiver by a preponderance of the evidence at the hearing on the motion to suppress. *State v. Bush*, 942 S.W.2d 489, 500 (Tenn. 1997). In determining whether a defendant has validly waived his *Miranda* rights, courts look to the totality of the circumstances. *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). If a suspect invokes his right to counsel under the Fifth Amendment, he or she "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

According to the State's proof presented at the suppression hearing, the defendant was advised of and invoked his right to counsel during his first interaction with Sergeant Stark at 10:03 a.m. on August 3, 2008, after which Sergeant Stark immediately left the interview room. The defendant then began to yell that he wanted to talk to somebody, so Sergeant Stark and Sergeant Davidson returned to the interview room. The defendant was again advised of his rights, to which he responded, "I am going to talk to you, but I want a cigarette, I want to talk to my dad and I want to talk to my lawyer." He refused to sign the waiver for the second time at 10:17 a.m. The defendant then began to question the officers about the case and the charges against him, and Sergeant Stark informed him that he was going to be charged with first degree murder and that they were going to take him back to the jail. At that point, the officers left the interview room again and asked Sergeant Max to prepare the defendant to be transported back to the jail.

When Sergeant Max entered the interview room to prepare the defendant for transport back to the jail, the defendant asked him what was going on and he responded that he was going to take the defendant back to the jail. The defendant queried again as to what was going on, and Sergeant Max said to him, "I can't

discuss with you what's going on, you don't want to waive your rights, I can't talk about this case." The defendant then stated that he wanted a cigarette and wanted to talk. Sergeant Max left the interview room and informed the other officers that the defendant wanted to talk. Sergeants Stark and Davidson returned to the interview room and advised the defendant of his rights a third time, at 10:44 a.m. The defendant waived his rights, and the officers interviewed him and then took a typed statement from him.

The defendant testified that he did not scream and yell for Sergeant Stark to return to the interview room the second time, claiming instead that the officers just came back in after ten or fifteen minutes without his beckoning. He also testified that, when Sergeant Max entered the interview room, he told the defendant that it was all right if he did not want to make a statement because Snipes had given them information and that he was going to get the death penalty because there was someone who was going to testify against him. He said that Sergeant Max told him that he would receive a sentence of thirteen to fifteen years if he gave a statement. However, he acknowledged that nowhere in his statement did he say that he was giving the statement in order to not face the death penalty and instead receive a sentence of thirteen to fifteen years.

We initially note that any conflicts in the testimony at the suppression hearing were resolved by the trial court as the trier of fact. As accredited by the trial court, the testimony at the suppression hearing shows that, after the initial contact with the defendant at 10:03 a.m., the officers did not initiate any further conversation with the defendant. Instead, it was the defendant who continued to initiate conversations with the officers despite the invocation of his right to counsel and, of his own accord, decided that he wanted to give a statement to the officers. Thus, the defendant's invocation of his right to counsel was anything but unequivocal. In looking at the totality of the circumstances surrounding the giving of the defendant's statements, the evidence does not preponderate against the trial court's finding that the defendant's statements were not made in violation of his Fifth Amendment rights.

*Smith*, 2012 WL 4372547, at *7–*8.

The TCCA correctly applied the applicable federal law on this issue. In *Miranda*, 384 U.S. at 444, the Supreme Court established procedures for custodial interrogations balancing the accused's privilege against self-incrimination and the right to counsel. The *Miranda* Court noted that a defendant may waive his rights, "provided the waiver is made voluntarily, knowingly and intelligently." (*Id.*) That said, once a defendant invokes his right to remain silent or states that

he wants an attorney present, the questioning must cease.  *Id.* at 444–45.  But the analysis does not always end there.

Questioning may resume however if the defendant himself begins more conversation about the investigation.

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.  We further hold that an accused, such as [the defendant], having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).  That said, "the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation."  *Oregon v. Bradshaw*, 462 U.S. 1039, 1044–45 (1983).

The TCCA identified and applied the proper standard to address whether Petitioner voluntarily waived his Fifth Amendment rights.  *Smith*, 2016 WL 3345247, at *7.  Once he requested counsel, the court must first consider whether the Petitioner did, in fact, reopen the dialogue with the authorities.  And both the trial court and the TCCA concluded that he did.  *Smith*, 2016 WL 3345247, at *8.  The TCCA noted that the trial court had the benefit of live testimony and made the required credibility determinations.  It then held that the totality of the evidence did not preponderate against the trial court's determination that Petitioner did not make his later statements in violation of the Fifth Amendment.  (*Id.*)  So it ruled for the State on this point.

Based on this Court's review of the transcript of the evidentiary hearing on the motion to suppress, (R., Suppression Tr., ECF No. 14-2), the decision of the TCCA is supported by the record. Petitioner no doubt knew of his right to counsel. The record reflects that the officers informed Petitioner of his right to counsel and he understood that because he requested counsel more than once. Even still, the trial court considered the live testimony and found that the preponderance of the evidence showed that Petitioner changed his mind without prompting by the officers and chose to talk with officers without counsel. In upholding that decision, the TCCA's decision was not contrary to, or an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts based on the evidence presented. This Court does not find evidence supporting a *Miranda* violation here. The Court therefore DENIES Petitioner's Issue 3.

## 2. Issue 4. Was the evidence sufficient to convict Petitioner of first-degree murder?

Petitioner next contends the TCCA's holding that the evidence supported his conviction for felony murder amounts to an unreasonable application of clearly established federal law and an unreasonable determination of the facts. (Second Am. Pet., ECF No. 10 at PageID 241.) In effect, Petitioner argues that the prosecution presented no proof that he made the scratches and pry marks on the victim's sliding glass door, presented no proof that he ransacked the house, and presented no proof that he committed theft of property. (*Id.* at PageID 241–42.) Rather, he claims that he entered the house to purchase marijuana. (*Id.* at PageID 242.) Respondent answers that the TCCA applied the correct federal rule and that its decision was correct. (Answer, ECF No. 15 at PageID 1745.)

After reviewing the evidence presented at trial, the TCCA opined:

The defendant argues that the evidence is not sufficient to sustain his conviction for murder in the perpetration or attempted perpetration of burglary, arguing there was no proof that committed or intended to commit burglary.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn.Crim.App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn.Crim.App. 1990).

A criminal offense may be established entirely by circumstantial evidence. *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. *State v. James*, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. *See State v. Dorantes*, 331 S.W.3d 370, 380–81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn.Crim.App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 219 Tenn. 4, 405 S.W.2d 768, 771 (1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

For the purposes of this case, felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . burglary." Tenn. Code Ann. § 39–13–202(a)(2) (2010). "No culpable mental state is required . . . except the intent to commit the enumerated offenses or acts." *Id.* § 39–13–202(b). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). Burglary occurs when one, "without the effective consent of the property owner, . . . [e]nters a building . . . with intent to commit a felony, theft or assault[.]" Tenn. Code Ann. § 39–14–402(a)(1).

Again, the defendant argues that there was no evidence to support the underlying felony of burglary in this case and therefore his felony murder conviction should be reversed. However, in the light most favorable to the State, there is sufficient evidence for a rational trier of fact to find that the defendant committed or intended to commit burglary. In such light, the proof at trial showed that the defendant and his co-defendant went to the victim's home for the purpose of "making money." The record reveals that the sliding glass door at the back of the victim's residence appeared to have scratches and pry marks around it as though someone had tampered with it, and the inside of the home had been ransacked with the victim's cell phone, money, BB gun, and marijuana missing. When the defendant was caught and arrested, the officers found cash, marijuana, and the victim's cell phone in the vehicle in which the defendant was found. *See* James, 315 S.W.3d at 450 (stating that possession of recently stolen property, unless satisfactorily explained, creates permissible inference that defendant gained possession through theft or had knowledge that the property had been stolen). Moreover, in the defendant's second statement to police, he admitted that he entered the victim's home with Snipes, and he admitted at trial that he took the victim's BB gun. Thus, the direct and circumstantial evidence is sufficient to support the jury's conclusion that the defendant committed or intended to commit a burglary to sustain his felony murder conviction.

*State v. Smith*, 2012 WL 4372547, at *8–*9.

Petitioner's burden for this claim is a heavy one indeed because the Court must consider the evidence in the light most favorable to the prosecution. In *Jackson v. Virginia*, the Supreme

Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 –
if the settled procedural prerequisites for such a claim have otherwise been satisfied – the
applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at
the trial no rational trier of fact could have found proof beyond a reasonable doubt." 443 U.S.
307, 324 (1979). This standard requires a federal district court to examine the evidence in the
light most favorable to the State. *Id.* at 326 ("a federal habeas corpus court faced with a record
of conflicting facts that supports conflicting inferences must presume – even if it does not
affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of
the prosecution, and must defer to that resolution").

Tennessee defines "first-degree felony murder" as a "killing of another committed in the
perpetration of or attempt to perpetrate any . . . burglary." Tenn. Code Ann. § 39-13-202(a)(2).
The petitioner must have possessed the intent to commit that felony. *Id.* § 39-13-202(b). The
jury decides whether the State proves the petitioner possessed the intent to commit that felony.
"Burglary" occurs when one, "without the effective consent of the property owner, . . . [e]nters a
building . . . with the intent to commit a felony, theft or assault." Tenn. Code Ann. § 39-14-
402(a)(1).

Considering the record here in a light most favorable to the prosecution, Petitioner's
argument that the prosecution introduced no proof to support the jury's verdict lacks merit. The
jury heard testimony from eyewitnesses and police officers. That testimony along with the other
evidence (direct and circumstantial) was enough to support the verdict here. Petitioner has not
met his burden of proving to this Court that the state court's resolution of this issue was
objectively unreasonable.

The TCCA applied the correct legal rule and cited both *Jackson v. Virginia* and state cases applying the *Jackson* standard. *State v. Smith*, 2012 WL 4372547, at *7–*8. The TCCA determined "that the direct and circumstantial evidence is sufficient to support the jury's verdict. *Id.* at *9. Based on this Court's review of the transcript of Petitioner's trial (R., Trial Tr., ECF Nos. 14-5, 14-6, 14-7, and 14-8), the TCCA correctly concluded that the testimony and evidence were more than enough to permit a rational trier of fact (the jury here) to find that Petitioner was guilty of murder in the perpetration or attempted perpetration of a burglary. The Court therefore DENIES Petitioner's Issue 4.

### 3. Issue 5. Was the trial judge's instruction on defense of others erroneous?

Finally, Petitioner claims that the trial court's jury instruction on defense of others was ambiguous and that the jury misapplied the instruction. (Second Am. Pet., ECF No. 10 at PageID 244–46.) Respondent replies that Petitioner failed to exhaust a federal constitutional claim in the state courts. (Answer, ECF No. 15 at PageID 1748.)

The TCCA examined this issue on direct appeal and determined:

> The defendant argues that the trial court erred in its instruction to the jury regarding the defense of others in that it included language precluding the defense where an innocent third person is recklessly injured or killed. Specifically, the defendant contends that the language from the Tennessee Pattern Jury Instruction, "[t]his defense is not available to the defendant if the victim was an innocent third person who was recklessly injured or recklessly killed by the [d]efendant's use of force," was "irrelevant and unsupported in the record."

> At the close of the proof, defense counsel requested that the court give an instruction on defense of a third person based on the defendant's belief that he was defending Snipes when he shot the victim. After discussion by the parties, the trial court agreed to instruct the jury on the defense. When the court inquired whether defense counsel had an instruction drafted, he responded, "I would just go with the Tennessee pattern instruction." At some point thereafter, the court's proposed instruction must have been brought to defense counsel's attention because the record contains a "Consent Order Adding a Statement of the

45

Proceedings to the Record," in which it is memorialized that there was an off-the-record bench conference held during which defense counsel objected to the inclusion of the language concerning reckless injury or death of an innocent third party. According to the consent order, defense counsel argued that there was no support in the record for the inclusion of such language and that it would confuse the jury, but the trial court gave the complete instruction.

"It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citing *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000); *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn.Crim.App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). An instruction will be considered prejudicially erroneous only if it fails to submit the legal issues fairly or misleads the jury as to the applicable law. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005) (citing *State v. Vann*, 976 S.W.2d 93, 101 (Tenn. 1998)).

Upon review, we conclude that the trial court did not err in giving the jury the complete charge on defense of others. Based on the testimony at trial, the jury was left to make the factual determination whether the victim was an aggressor or an innocent third party. The applicable law clearly allowed the defendant to claim that he was defending Snipes from the actions of a third person who was threatening or using deadly force against Snipes. However, the law also precluded the defendant from obtaining relief under a claim of defense of others if the jury were to find that the victim was innocent. Based on the facts presented to the jury and the applicable law, the charge provided by the court was a correct and complete statement of the law and not misleading to the jury.

*State v. Smith*, 2012 WL 4372547, at *10.

The Supreme Court established the standard for evaluating a habeas petitioner's claim based on an erroneous jury instruction. *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). In *Estelle* the Court emphasized that errors by a state court in the application of state law do not afford a proper basis for relief under 28 U.S.C. § 2254. (*Id.*) From this Court's review of Petitioner's appellate brief, (R., Br. of Appellant, ECF No. 14-14 at PageID 1380–81), and the state court decision, Respondent is correct—Petitioner did not exhaust this issue in state court as a violation of federal law.

By making a fleeting reference to the "Sixth Amendment to the United States Constitution," Petitioner did not "fairly present" this issue as a federal claim to the state appellate courts, as required by *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). *See* (R., Br. of Appellant, ECF No. 14-14 at PageID 1380.) This Court finds that no state court decision contains the necessary federal content to constitute a ruling on the merits of a federal constitutional claim. Petitioner has therefore failed to exhaust this federal constitutional claim in state court. No further avenue exists for exhausting the claim as a federal constitutional claim and Petitioner is therefore barred from bringing the claim here by the procedural default doctrine. What is more, the exhausted state law claim addressed by the TCCA is noncognizable in this forum. This Court therefore DENIES Petitioner's Issue 5.

All in all, this Court finds the issues raised in this petition lack merit, are noncognizable, and barred by procedural default. The petition is therefore **DISMISSED WITH PREJUDICE**. The Court will enter Judgment for Respondent.

## <u>APPELLATE ISSUES</u>

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must reflect the specific issue or issues that satisfy the required showing. 28 U.S.C. §§ 2253(c)(2)-(3). A petitioner makes a "substantial showing" when the petitioner shows that "reasonable jurists could debate whether (or, for that matter, agree

that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must show that reasonable jurists could disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed more).

A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Slack*, 537 U.S. at 337).

Here, there can be no question that the claims in this petition lack merit and are barred by procedural default. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court **DENIES** a certificate of appealability.

Here for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. The Court **CERTIFIES** therefore, under Fed. R. App. P. 24(a), that any appeal here would not be taken in good faith and **DENIES** leave to appeal in forma pauperis.[9]

**SO ORDERED**, this 29th day of August 2019.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE

_____

[9] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or move to proceed in forma pauperis and supporting affidavit in the Sixth Circuit within 30 days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).